No. 91,980

STATE OF KANSAS, *Appellee*, v. CHASITY L. BOYD, *Appellant*.

(127 P.3d 998)

Opinion filed February 10, 2006.

*Rick Kittel,* assistant appellate defender, argued the cause and was on the brief for appellant.

*Paul J. Morrison,* district attorney, argued the cause, and *Steven J. Obermeier,* assistant district attorney, and *Phill Kline,* attorney general, were with him on the brief for appellee.

The opinion was delivered by

LUCKERT, J.: Chasity L. Boyd (Boyd) was convicted by a jury of first-degree felony murder and two counts of abuse of a child. Boyd appeals her convictions, arguing: (1) the trial court abused its discretion in not granting her motion to sever her trial from that of her codefendants; (2) the trial court erred in failing to give instructions on lesser included offenses; and (3) the trial court erred in admitting evidence of child abuse other than the acts charged in this case.

## FACTS

On December 30, 2002, 9-year-old Brian Edgar's lifeless body was brought to the emergency room at KU Medical Center by his father, Neil Edgar. Rigor mortis had already set in, indicating Brian had been dead for several hours. Medical staff noticed that Brian had what appeared to be white tape residue on his face and the back of his head, bruises on his face, and suspicious injuries and scarring on his wrists and ankles.

When initially told of his son's death, Neil told doctors and, later, police that he was responsible for Brian's death. His first statement was that it was an accident resulting from his giving Brian a melatonin pill to help him sleep which must have caused him to stop breathing.

Police initiated an investigation. Neil consented to a search of a residence which he identified as the family's home. At that location, police discovered a sock with a piece of duct tape attached. When confronted with this evidence, Neil told police he had restrained Brian with belts around his arms and ankles, put a sock in Brian's mouth to keep him from "hollering" and put a small piece of duct tape over his mouth. Police were doubtful of Neil's story because they knew Brian's entire head had been taped, not just his mouth.

Neil also stated that his wife knew about his restraining Brian but never participated in it.

The investigating officers determined that Brian was one of four children living in the Edgar home. Neil, who was a church pastor, and his wife, Christy Edgar, who was an evangelist and prophet for the church, had adopted three siblings in 1997: Christon, Martez, and Christina. The Edgars adopted Brian a few years later; he was biologically unrelated to the three other children. At the time of trial, Christon was 16 years old, Martez was 12 years old, and Christina was 9 years old. Police also learned that Boyd, who was referred to by the Edgars as their "granddaughter," often stayed with the family, babysitting the children, and that she had stayed over the night Brian died.

Police took the surviving Edgar children into custody and transported them to Sunflower House, a child advocacy center, for forensic interviews. Both Christina and Martez were initially reluctant to disclose any information but eventually began to open up. Both children told detectives that they had been frequently tied up with socks, duct tape, and plastic ties. Christina said that Boyd had tied up the children at the direction of Christy.

The next day, when police talked to Neil again and told him of their interviews with his other children, he said, "I did it. If my kids say I've done it, I did it." The police did not believe Neil was being truthful and thought he would admit to anything they said. Through the course of these interviews during the initial stages of the investigation, Neil never implicated Boyd.

As a result of the investigation, Neil, Christy, and Boyd were charged under separate complaints with the same crimes. Count I of the complaint against Boyd charged felony murder, in violation of K.S.A. 21-3401, occurring during the commission of abuse of a child by inflicting cruel and inhuman corporal punishment upon Brian Edgar. Counts II and III charged her with child abuse, in violation of K.S.A. 21-3609, arising from inflicting cruel and inhuman corporal punishment upon Martez and Christina Edgar, respectively, during the time period of May 9, 2002, through December 30, 2002.

The trial court consolidated the three cases for trial. Before opening statements, Christy pled guilty to all of the charges. After consent from the codefendants' attorneys, the jury was informed of Christy's plea and the trial against Neil and Boyd continued.

During the trial, medical evidence was presented establishing that Brian died of asphyxiation when he aspirated his own vomit while a foreign object was blocking his mouth. The medical examiner also opined that the injuries and scarring on Brian's wrists and ankles were consistent with ligature marks and were of different ages, from a few weeks to more than a year old.

In other testimony presented at trial, detectives recounted the initial admissions by Neil. With the exception of those statements by Neil, virtually all other evidence implicated Boyd. Christon explained that the night before Brian's death, Christy and Boyd stuffed a sock in Brian's mouth and taped him from his feet to his shoulders "like a mummy." The next night, the night of Brian's death, Boyd and Christy again taped Brian like a mummy, this time continuing past his shoulders to cover his mouth, which had been stuffed with a sock, and all of his nose except his nostrils. Christon told the jury one of the women said something like "try to get out of that one." Christon also testified that he saw Boyd carry Brian to an enclosed area under the basement stairs where he was left to sleep for the night on a sleeping bag placed on the concrete floor.

According to Christon, Boyd and Christy were punishing Brian for stealing food. This was verified by a note which had Boyd's fingerprints on it. The note read:

"Evangelist, Brian hasn't had enough. He stole a piece of your candy that goes on your paper towel for church while we were going up to sing and when we came back I seen him digging in his pocket and I looked in his pocket, and he was eating on one of your Cream Savers, and lied and said Cookie gave him two peppermints and that's not a mint. Then he finally told the truth."

The evidence also established that Boyd had bound Brian's brother and sister, Martez and Christina. Again, this evidence was basically uncontroverted. Detectives reviewed their interviews with Christina and Martez, recounting statements which had not been videotaped. Jurors were then shown videotaped interviews. Addi-

tionally, Martez and Christina testified via closed-circuit television after the trial court found they would be extremely traumatized by testifying in the presence of their parents. Martez testified that he had been tied up twice by Boyd. Once was on the night Brian died, when Boyd tied Martez' hands in front of him with socks placed over his arms first to keep the plastic ties from scarring him after Martez had got in trouble with his father because Martez was talking too much. Martez testified that his father did not tell Boyd to tie him up. Martez also testified that on previous occasions he had seen Boyd tie up Brian after his mother had told Boyd to get the ties.

Christina testified that Boyd had taped her or used plastic ties to restrain her. She had also had a stocking or tape put over her mouth. On the night Brian died, Christina said all three of the youngest children had been in trouble. Christina was tied up and slept on the floor in a room in the basement.

Both Martez and Christina had scars on their wrists consistent with ligature marks. Christina also had scars on the back of one leg and one shoulder consistent with having been hit with a looped cord.

Another witness at the trial, Chauntel Williams, a member of the Edgars' church, testified that Christy said God had told her about a new way of disciplining the children by tying them up. Williams had seen Brian, Martez, and Christina tied up by their hands and feet with plastic ties at the direction of Christy.

Neil testified in his own defense. Neil said that Christy and "the womens [sic] of the church" handled the discipline of the children. According to Neil, on the night Brian died, he had seen that Brian's hands and legs had been taped and knew it was done to keep him from getting up, but he did not think Brian would be harmed by it. He told the jury that he lied to the doctor because he knew his wife and Boyd had done something wrong.

Boyd did not testify, but she called several witnesses who described her and her involvement in the Edgars' church. Because Boyd's mother was a church member, Boyd had been involved with the church since the age of 8 and was there every day. Boyd, who was 20 years old at the time of trial, was described as needy, sub-

missive, and someone who acted younger than her age. Witnesses also described how Christy, acting as evangelist and prophet, controlled everyone in the church and told them how to behave. One former church member described the church as a cult that brainwashed its members.

The jury convicted Boyd and Neil on all three counts. The trial court sentenced Boyd to a controlling term of life imprisonment, with parole eligibility after 20 years. She was sentenced to 32 months' imprisonment on each of the child abuse convictions, with those sentences to run concurrent with each other and concurrent with the felony-murder conviction.

## ANALYSIS

### I. MOTION TO SEVER

Boyd contends that the trial court erred in denying her motion to sever her trial from that of codefendant Neil Edgar. Boyd's primary argument is based on the trial court's ruling which allowed Martez and Christina Edgar to testify by closed-circuit television based upon a finding that they would be traumatized by testifying in the presence of their parents. Because there was no direct evidence presented that the children would be similarly traumatized by testifying in the presence of Boyd, she contends her right of confrontation was violated by the trial court's failure to order a separate trial wherein Martez and Christina could have testified in person. Boyd also contends that she and Neil had antagonistic defenses which required severance of their trials.

### A. Procedural History

The State filed a pretrial motion to admit the testimony of Martez and Christina Edgar via closed-circuit television. The motion alleged that the children's counselor was of the opinion that "if both children were required to testify about the events which resulted in the death of Brian Edgar, while their parents are physically present, they would become extremely confused and would be unable to testify before a jury much less communicate what they witnessed."

The trial court appointed psychologist Dr. Jeffrey Montolio as an independent expert to evaluate the children with respect to their ability to testify, the psychological effects that testifying in the courtroom or via closed-circuit television might have on them, and whether testifying in the presence of their adoptive parents, Neil and Christy Edgar, would be traumatic for them. After interviewing both children as well as their therapist, Dr. Montolio concluded that if the children were "to testify in the presence of their ex-adoptive parents, there would in fact be undue psychological injury likely to last for many years to come, this injury would be severe and substantially greater than the average reaction of a victim of child abuse." According to Dr. Montolio, there were two factors at work. First, the children had been asked to tell their story a number of times and their therapist believed that "if the children were asked to tell their story again, under any circumstances, they would " 'shut-down' and be non-responsive." Second, the children would likely have "intrusive traumatic memories" which would interfere with their ability to accurately recount events if they had to do so in the presence of their adoptive parents. Nonetheless, Dr. Montolio concluded that the children would be able to testify via the "safe venue" of closed-circuit television without being psychologically traumatized because both children had indicated they felt comfortable with such a procedure and would be willing to tell their story again so long as their parents were not present.

Dr. Montolio did not evaluate and had no opinion on whether the children would be traumatized by testifying in the presence of Boyd.

Immediately after Dr. Montolio's testimony, defense counsel for Boyd stated that if the trial court were inclined to grant the State's motion and allow Martez and Christina to testify via closed-circuit television, then Boyd's trial should be severed in order to protect her right to confront and cross-examine the children in open court. The court took the matter under advisement.

At a later hearing prior to trial, the trial court ruled that the State could present the children's testimony via closed-circuit television as to all three codefendants. Although the court noted that Dr. Montolio had not directly considered whether the children would

be traumatized by testifying in the presence of Boyd, the court found from Dr. Montolio's report clear and convincing evidence that the children would be traumatized by testifying in open court where they were asked to face any alleged perpetrator, including Boyd. Boyd's defense counsel then renewed her motion for severance, which the trial court denied.

Defense counsel again renewed Boyd's motion for severance after the jury had been selected, arguing the confrontation issue and also antagonistic defenses. Her motion was overruled. During trial, she made a contemporaneous objection to the admission of Martez' and Christina's testimony via closed-circuit television on confrontation grounds and again renewed her motion to sever at that time. She did not, however, object to the admission of testimony from detectives and employees of Sunflower House about statements Christina made to them during forensic interviews. Nor did she object to the admission of videotapes of the various interviews of Christina. Further, she did not object to detectives and Sunflower House employees testifying about statements made by Martez. Boyd did, however, assert an objection to the videotape of Martez' interview. Initially, her attorney objected on the grounds of hearsay and a Confrontation Clause violation. However, after a conference outside the presence of the jury, counsel stated, "I would rather the children testify first, but other than that I don't have any objection."

## B. Severance Generally

The decision whether to grant a defendant's motion for severance lies within the sound discretion of the trial court. On appeal, an abuse of discretion standard applies to a denial of a request to sever trials. *State v. White*, 275 Kan. 580, 589, 67 P.3d 138 (2003). Judicial discretion will vary depending upon the character of the question presented for determination. Generally, the trial court's decision is protected if reasonable persons could differ upon the propriety of the decision as long as the discretionary decision is made within and takes into account the applicable legal standards. However, an abuse of discretion may be found if the trial court's decision goes outside the framework of or fails to properly consider

statutory limitations or legal standards. *Dragon v. Vanguard Industries, Inc.,* 277 Kan. 776, 89 P.3d 908 (2004); see *State v. Richard,* 252 Kan. 872, 881-82, 850 P.2d 844 (1993). When a decision is made regarding joinder or severance, even if it is determined that there was an abuse of discretion, the defendant has the burden of showing prejudice requiring reversal. *State v. Crawford,* 255 Kan. 47, 54, 872 P.2d 293 (1994).

There are several steps of analysis to be applied in deciding whether to consolidate cases. There is no statute which authorizes consolidation when two or more defendants are charged in separate complaints as was done in this case. However, case law recognizes the inherent authority of a trial judge to order consolidation. *State v. Aikins,* 261 Kan. 346, 358, 932 P.2d 408 (1997). "The test for joinder of two or more cases for trial is the same as that for charging two or more defendants in the same complaint, information or indictment." *State v. Tate,* 228 Kan. 752, 753, 620 P.2d 326 (1980); see *State v. Hunter,* 241 Kan. 629, 632-33, 740 P.2d 559 (1987); *State v. Coe,* 223 Kan. 153, 157-58, 574 P.2d 929 (1977).

K.S.A. 22-3202(3) provides that two or more defendants may be charged in the same complaint if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting a crime or crimes. This court has explained:

"Several defendants may be joined together in one trial, even if they were not in fact charged together in one complaint, in the following circumstances:
'(1) when each of the defendants is charged with accountability for each offense included, or (2) when each of the defendants is charged with conspiracy and some of the defendants are also charged with one or more offense alleged to be in furtherance of the conspiracy, or (3) when in the absence of a conspiracy it is alleged the several offense charged were part of a common scheme or were so closely connected in time, place and occasion that proof of one charge would require proof of the others.' [Citation omitted.]" *Aikins,* 261 Kan. at 359 (quoting *Tate,* 228 Kan. at 754).

In this case, the trial court correctly found that the complaints charged the three codefendants—Neil, Christy, and Boyd—with the same crimes arising from the same acts; each was charged with

accountability for each offense included. Christy, Neil, and Boyd were alleged to have bound and gagged all three children and, thus, committed inhuman and cruel acts of child abuse or aided and abetted in the commission of those crimes. Thus, they could have been charged together in one complaint. Consequently, the court had the discretion to consolidate the complaints for trial. *Aikins,* 261 Kan. at 359 (determination of whether several defendants could have been charged in same complaint and thus tried together rests in trial court's discretion); *Tate,* 228 Kan. at 753 (same).

However, "even though the requirements of joinder are technically satisfied, the court should not join two defendants in one trial if either defendant will be prejudiced by joinder. [Citation omitted.]" *Aikins,* 261 Kan. at 360. Separate trials should be conducted upon a showing of actual prejudice stemming from a joint trial and, in such a circumstance, the trial court should not join the complaints or, if the complaints have been joined, should sever the cases for trial. 261 Kan. at 360; see K.S.A. 22-3204 (providing court may order a separate trial for any one defendant when requested by such defendant or by the prosecuting attorney); *Zafiro v. United States,* 506 U.S. 534, 538-39, 122 L. Ed. 2d 317, 113 S. Ct. 933 (1993) (rejecting bright line rule mandating severance when defendants have conflicting defenses; concluding mutually antagonistic defenses are not prejudicial per se and severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence").

The usual factors to be considered in determining whether a joint trial is sufficiently prejudicial to mandate severance (or nonjoinder) are:

"(1) the defendants have antagonistic defenses; (2) important evidence in favor of one of the defendants which would be admissible on a separate trial would not be allowed on a joint trial; (3) evidence incompetent as to one defendant and introducible against another would work prejudicially to the former with the jury; (4) the confession by one defendant, if introduced and proved, would be calculated to prejudice the jury against the others; and (5) one of the defendants who could give evidence for the whole or some of the other defendants would become

a competent and compellable witness on the separate trials of such other defendants." *White*, 275 Kan. 580, Syl. ¶ 2.

See *State v. Davis*, 277 Kan. 231, 240, 83 P.3d 182 (2004).

Boyd's arguments fall within the first and third factors, *i.e.,* antagonistic defenses and evidence incompetent as to one defendant and introducible against another would work prejudicially to the former with the jury.

## C. Antagonistic Defenses

In *White,* this court described when antagonistic defenses may justify severance:

"[A]ntagonistic defenses, has been referred to as the 'most compelling ground for severance.' [Citation omitted.] Antagonistic defenses occur when each defendant is attempting to convict the other or where the defenses conflict to the point of being mutually exclusive or irreconcilable. [Citation omitted.] 'The classic example of intrinsically antagonistic defenses is where both defendants blame each other for the crime while attempting to defend against the State's case.' [Citation omitted.] Short of this type of dichotomy, defenses will not be deemed antagonistic. For example, a dispute over who was the more culpable, such as arguing over who was the triggerman versus the aider and abettor, is not antagonistic. [Citations omitted.] Nor are inconsistent trial strategies. Further, the presentation of evidence by one defendant which is inconsistent with the evidence presented by another defendant does not make the defenses antagonistic. [Citation omitted.]" 275 Kan. at 590.

Under this standard, this case does not present a situation of antagonistic defenses. Neil Edgar's defense was to disclaim involvement and intent. He testified that discipline was only carried out by Christy "and the womens [*sic*] of the church." Neil claimed he knew taping was sometimes used as a disciplinary measure but did not know the women had taped Brian's mouth and head. He also said that he lied to the doctor at the hospital about what had happened to Brian because he knew his wife and Boyd had done something wrong. During closing argument, counsel for Neil argued:

"[T]he prosecution has already got the person who did this, the evangelist, the prophet, the manipulator. She was the person that did this; she was the person that told this poor little girl, You better wrap that head. And what does the little girl say? What does Chasity say? I bet you can't get out of that."

This strategy was not inconsistent with the defense presented by Boyd. According to Boyd, her approach was to blame Neil and Christy. She did so by introducing evidence that she was particularly susceptible to the influence of Christy, who told her to do the taping, and by eliciting evidence of Neil's initial statements to police where he claimed responsibility and said Boyd was not involved.

The State introduced the evidence of Neil's statements to police, including evidence that the police did not believe what he told them. While Boyd's counsel did cross-examine the witnesses who testified about Neil's statements, she did not mention those statements during closing argument. Rather, Boyd's closing argument focused entirely on whether she was acting under the influence of Christy and whether she intended for Brian to die. In other words, Boyd attempted to blame Christy, not Neil, for Brian's death. Boyd's argument that she did not intend for Brian to die was the same argument made by Neil in his closing argument.

The State contends that both Neil and Boyd were blaming Christy, who had already pled guilty to the crimes; therefore, their defenses were not antagonistic. For the most part, the State's contention has merit. However, Neil also blamed Boyd for the crime. But Neil's blaming of Boyd was not actually antagonistic to her defense. He introduced no evidence to contradict her claim that Christy was in charge and told her what to do. Neil merely asserted that Boyd was at the house that night and that any binding of Brian was done by Boyd and Christy.

Furthermore, the State correctly notes that the jury was instructed consistent with PIK Crim. 3d 52.07 to give separate consideration to each defendant and that any evidence limited to one defendant should not be considered as to the other.

Under these circumstances, the trial court did not abuse its discretion in denying Boyd's motion for severance based on antagonistic defenses.

### D. Closed-Circuit Television Procedure For Child-Victim Testimony

Boyd also presents an argument which falls within another factor

to be considered for severance—evidence incompetent as to her and introducible against Neil Edgar was prejudicial to Boyd with the jury. Specifically, Boyd argues her right to confrontation was violated by the admission of Martez' and Christina's testimony via closed-circuit television where there was no evidence that the children would have been traumatized by testifying in her presence. Accordingly, Boyd contends the trial court should have severed her trial so that she could have confronted Martez and Christina face-to-face.

K.S.A. 22-3434 provides that a child victim less than 13 years of age may testify by closed-circuit television if the State establishes "(b) . . . by clear and convincing evidence that to require the child who is the alleged victim to testify in open court will so traumatize the child as to prevent the child from reasonably communicating to the jury or render the child unavailable to testify." The trial court is required to make an individualized finding of trauma before proceeding. K.S.A. 22-3434(b).

In *State v. Chisholm*, 250 Kan. 153, 825 P.2d 147 (1992), this court announced that, based on the United States Supreme Court's decision in *Maryland v. Craig*, 497 U.S. 836, 111 L. Ed. 2d 666, 110 S. Ct. 3157 (1990), the following standard applies to the use of closed-circuit television for child-victim witness testimony pursuant to K.S.A. 22-3434:

"A defendant . . . is not denied the constitutional right to confrontation where the child-victim witness testifies via closed-circuit television, pursuant to K.S.A. 22-3434, provided the trial court (1) hears evidence and determines use of the one-way closed circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify; (2) finds that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant; and (3) finds that the emotional distress suffered by the child witness in the presence of the defendant is more than de minimis, *i.e.*, more than mere nervousness or excitement or some reluctance to testify." *Chisholm*, 250 Kan. 153, Syl. ¶ 5.

The State responds that the trial court correctly ruled that Martez and Christina would be traumatized by testifying in open court in the presence of any perpetrator, not just a parent. The trial court relied on Dr. Montolio's report in making this finding. The court

stated, "[T]he evidence is clear and convincing that these alleged child victim witnesses would be traumatized by requiring their testimony in open court." The court noted that the children's therapist believed they might "shut down" completely if asked to testify, while Dr. Montolio thought they would be able to do so by closed-circuit television. The court stated, "But in any event, to require these alleged child victims to testify by closed circuit TV in one situation and open court in another, it is clear from what Dr. Montolio said that that would cause, in his opinion, long-term problems for these children." The court concluded that "under these circumstances . . . the same potential trauma and inability to testify or to reasonably communicate with the jury occurs in any trial where these children are asked to face an alleged perpetrator."

In reviewing these arguments and the trial court's findings, the standard for review is abuse of discretion. " 'The sufficiency of proof of unavailability [of a witness] is a question for the trial court within its discretion and its ruling will not be disturbed unless an abuse of discretion is shown.' [Citation omitted.]" *State v. Swafford*, 255 Kan. 807, 812, 878 P.2d 820 (1994). As previously noted, to apply this standard we first must determine if the trial court applied the correct legal standard and, if so, then determine whether no reasonable person would agree. *Dragon*, 277 Kan. at 779; *Richard*, 252 Kan. at 881-82; see *Bradley v. Mississippi*, 921 So. 2d 385, 387-88 (Miss. App. 2005) (applying abuse of discretion standard in reviewing sufficiency of rulings regarding use of closed-circuit television procedure for child-victim testimony); *Barnes v. Texas*, 165 S.W.2d 75, 84 (Tex. App. 2005) (same).

There are two problems with the trial court's ruling. First, Dr. Montolio's report focuses completely on whether Martez and Christina would be capable of testifying in the presence of their parents, not any perpetrator. In *Craig*, 497 U.S. at 855, the Court stated: "The requisite finding of necessity must of course be a case-specific one" and, thus, "[t]he trial court must hear evidence." See *Chisholm*, 250 Kan. at 162-63 (noting *Craig* requirement of evidence and finding requirement satisfied by mother's testimony that child-victim witness expressed fear of defendant and by trial court's

own observation of witness at preliminary hearing where child victim was not able to communicate). In this case, there was no evidence related to Boyd that the children would be traumatized by testifying against her.

Second, the trial court's findings concentrate on whether the children would be traumatized by testifying in open court or having to testify more than once. As noted by the United States Supreme Court in *Craig*, 497 U.S. at 856, a mere finding that a child victim would be traumatized by testifying in open court is not sufficient:

"Denial of face-to-face confrontation is not needed to further the state interest in protecting the child witness from trauma unless it is the presence of the defendant that causes the trauma. In other words, if the state interest were merely the interest in protecting child witnesses from courtroom trauma generally, denial of face-to-face confrontation would be unnecessary because the child could be permitted to testify in less intimidating surroundings, albeit with the defendant present."

Thus, the trial court erred in ruling that the testimony of child victims via closed-circuit television could be used at trial against Boyd. With regard to her request for severance, the trial court failed to properly apply the legal standards for determining whether evidence which was admissible as to Neil was not competent as to Boyd and, thus, abused its discretion. However, as previously stated, Boyd must establish that this abuse of discretion resulted in prejudice.

### E. Harmless Error

Because the error violated Boyd's rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution and Section 10 of the Kansas Constitution Bill of Rights, a constitutional harmless error analysis applies. See *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824, *reh. denied* 386 U.S. 987 (1967). To find the error harmless, this court must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. *State v. Atkinson*, 276 Kan. 920, 925, 80 P.3d 1143 (2003); *State v. Siard*, 245 Kan. 716, 721, 783 P.2d 895 (1989).

In *Coy v. Iowa*, 487 U.S. 1012, 1021-22, 101 L. Ed. 2d 857, 108 S. Ct. 2798 (1988), the United States Supreme Court stated: "An assessment of harmlessness cannot include consideration of whether the witness' testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation; such an inquiry would obviously involve pure speculation, and harmlessness must therefore be determined on the basis of the remaining evidence." This analysis is contrary to the harmless error analysis in *State v. Eaton*, 244 Kan. 370, 385-86, 769 P.2d 1157 (1989), *overruled in part by Chisholm*, 250 Kan. at 168. *Chisholm* overruled the portion of the *Eaton* opinion setting forth the standard for use of child-victim witness testimony under K.S.A. 22-3434. Today, we overrule the portion of the *Eaton* opinion regarding the test or factors to be applied in making a harmless error analysis when considering a Confrontation Clause violation arising from the application of K.S.A. 22-3434. See 244 Kan. at 385-86.

The United States Supreme Court in *Delaware v. Van Arsdall*, 475 U.S. 673, 89 L. Ed. 2d 674, 106 S. Ct. 1431 (1986), crafted a list of factors to be used in analyzing Confrontation Clause violations, indicating that the importance of the testimony to the State's case is only one of several factors to consider. This court has since applied the *Van Arsdall* analysis, stating:

" 'The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors to be considered include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.' " *Atkinson*, 276 Kan. at 930 (quoting *Van Arsdall*, 475 U.S. at 684).

Although we have not considered and applied these factors in the context of testimony of a child witness being submitted by closed-circuit television without required findings, other courts have. See, *e.g., Hopkins v. State*, 632 So. 2d 1372, 1377 (Fla. 1994).

The first of the factors to be applied is the importance of the testimony in the prosecution's case and the second is whether the testimony is cumulative. Martez' and Christina's testimony had little importance with regard to the felony-murder count because neither of the children said anything about Boyd being involved with what happened to Brian the night of his death; in fact, Martez blamed his father. Both children did testify that Brian previously had been punished by being bound with tape or ties, but this testimony was cumulative with that of Neil, Christon, and Chauntel Williams.

Obviously, Martez' and Christina's testimony was more important with regard to the two counts of abuse in which they were the alleged victims. Again, however, the testimony was cumulative. Although Neil did not directly implicate Boyd as having committed abuse upon Martez and Christina, he told the jury the "womens" were in charge of discipline and explained Boyd's role as babysitter. Also, the children's trial testimony was largely cumulative of their statements to detectives and employees of Sunflower House, testimony to which Boyd did not object and which would have been admissible even if Boyd had been tried separately. The investigators who took the children's statements testified about many of the things which Martez and Christina had said.

For example, Kansas City, Kansas, Police Captain John Cosgrove testified that Martez had explained he was fortunate that he was punished by being bound rather than having his hands cut off for stealing, that plastic ties were used to bind his hands, and that Boyd referred to the ties as the type the police use. These statements, at a minimum, established Boyd as an aider and abettor to the abuse. Christina told Captain Cosgrove that their mother would tell Boyd to tie them up and Boyd would do the taping or tying. She said that Boyd would regularly tie her up and that Boyd had tied her up the night that Brian died. Additionally, Boyd did not object to the videotape of Christina's interviews being shown to the jury and, although initially objecting to the videotape of Martez' interviews, ultimately waived any objection except as to the order of proof. These videotapes, like the children's unrecorded state-

ments, could have been admitted even if Boyd had been tried separately.

We do note that the only time Martez directly stated that Boyd had restrained him was in his trial testimony. However, this testimony was cumulative to Christina's statement in her pretrial interviews that Boyd had tied up her brothers at her mother's direction. Also, there was a great deal of evidence of a pattern of abuse during the period from May to December 2002, the time period charged in counts II and III.

The third factor to be considered in evaluating whether a Confrontation Clause violation was harmless error is: was the testimony corroborated or contradicted? In almost all respects, the testimony was corroborated. There was physical evidence that both children were scarred in a manner consistent with ligatures being placed on their wrists and ankles. Also, Boyd's fingerprints were on the note calling for punishment of Brian. The primary point of contradiction was Martez' identification of his father as the person who bound Brian on the night of his death, while all other evidence pointed to Boyd and Christy as the primary actors and Neil as an aider and abettor. If anything, Boyd benefitted from Martez' testimony on this point.

The fourth consideration is the extent of cross-examination otherwise permitted. As we have recognized: "The right of confrontation encompasses both the right to cross-examination and the right to observe an accuser face to face. However, the primary purpose of the clause is to give the accused the opportunity for cross-examination. [Citation omitted.]" *State v. Johnson,* 240 Kan. 326, 329, 727 P.2d 1169, *cert. denied* 481 U.S. 1071 (1987); *State v. Carter,* 278 Kan. 74, 78-79, 91 P.3d 1162 (2004); *Chisholm,* 250 Kan. 153, Syl. ¶ ¶ 1-3. In this case, the right of cross-examination was fully realized with regard to Martez' and Christina's closed-circuit testimony. Boyd's attorney was in the room with the children and was allowed the opportunity to question them. See K.S.A. 22-3434(c)(1) and (2).

The final consideration is the strength of the evidence. Overall, the evidence against Boyd was strong even without the testimony of the children at trial.

After considering each of these factors, we conclude beyond a reasonable doubt that the Confrontation Clause violation was harmless error.

## II. LESSER INCLUDED OFFENSES

Next, Boyd argues that the trial court committed reversible error in refusing to instruct the jury on lesser included offenses. At the instructions conference, Boyd requested that the trial court instruct the jury on unintentional second-degree murder and involuntary manslaughter as lesser included offenses of felony murder. Boyd argued the evidence supported such instructions because her intent was at issue. Boyd also requested instructions on endangering a child and criminal restraint as lesser included offenses of both felony murder and child abuse. On appeal, Boyd has apparently abandoned her argument as to criminal restraint and argues only that the trial court should have instructed on endangering a child as a lesser included offense of each of the child abuse counts involving Martez and Christina.

The trial court found that endangering a child and criminal restraint were not lesser included offenses of child abuse based on the elements of those offenses, thus the court refused to instruct on those offenses. The trial court also found that the evidence of the underlying felony of child abuse was not weak or inconclusive, thus the court refused to give any lesser homicide instructions.

### A. Felony Murder

A trial court is required to instruct on lesser included offenses of felony murder only when the evidence of the underlying felony is weak, inconclusive, or conflicting. *State v. Boone*, 277 Kan. 208, Syl. ¶ 6, 83 P.3d 195 (2004). This is because "[a] defendant's commission of the underlying felony supplies elements which must be absent from the lesser degrees of homicide, and a jury should be instructed only on lesser offenses of which the defendant reasonably may be convicted." *State v. Altum*, 262 Kan. 733, 738, 941 P.2d 1348 (1997). This court has previously decided cases addressing whether lesser included offense instructions were required when the defendant was charged with felony murder based on the

underlying felony of child abuse and in those cases has applied the test of whether the evidence of the underlying felony is weak, inconclusive, or conflicting. See, *e.g.*, *State v. Struzik*, 269 Kan. 95, 113, 5 P.3d 502 (2000), *State v. Heath*, 264 Kan. 557, 572-73, 957 P.2d 449 (1998); *Altum*, 262 Kan. at 738-39; *State v. Hupp*, 248 Kan. 644, 652-53, 809 P.2d 1207 (1991).

Boyd contends that the evidence supporting the underlying felony of child abuse was weak, conflicting, and inconclusive. She specifically points to Neil's initial statements to police that he was responsible for Brian's death and to Christy's guilty plea. She also contends that the evidence would have supported the giving of instructions on unintentional second-degree murder and involuntary manslaughter based on reckless, rather than intentional, conduct.

In support of her argument, Boyd cites *Altum*, 262 Kan. 733. In that case, the defendant argued that the jury should have been instructed on second-degree murder and involuntary manslaughter as lesser included offenses of felony murder. The medical evidence in the case showed that the child victim had been severely beaten and shaken to an extent that there was no possibility the injuries were accidentally inflicted. Thus, "[t]he only question was who had abused the child." 262 Kan. at 738. The court considered the defendant's argument that someone else might have been responsible:

"Although the defense conjectures that the child's mother [Phipps] may have inflicted the injuries, evidence supporting this theory is inconclusive, at best. It consists primarily of instances of Phipps' evading questions or giving inconsistent accounts. In addition, the jurors heard Altum's mother contradict Phipps' accounts and they heard the testimony of several witnesses about Phipps' apparent lack of concern for her son's condition. In other words, an unflattering picture of her general character and trustworthiness was painted. Evidence that would have linked her to the abuse that killed Dylan, however, is missing." 262 Kan. at 738.

The court concluded: "In this case, the evidence of Altum's committing the offense of child abuse was neither weak nor inconclusive, and there was no call for instructions on lesser degrees of homicide." 262 Kan. at 739.

This portion of the *Altum* opinion is ambiguous and, as Boyd argues, could be interpreted as saying that, had there been more substantial evidence that the child's mother perpetrated the abuse, the evidence against Altum might have been sufficiently inconclusive so as to justify the giving of lesser included offense instructions. However, the *Altum* court also utilized the following reasoning which ultimately served as the basis for the court's holding:

"[I]f Altum perpetrated the child abuse, his role in that felony would supply the elements of deliberation and premeditation, both of which must be absent from second-degree murder and manslaughter. Thus, either the child abuse was perpetrated by Altum and he necessarily is responsible for the murder, or he did not perpetrate the child abuse where the child's death was caused and is not guilty of any degree of homicide." 262 Kan. at 739.

The ambiguity of the *Altum* decision was resolved by the holding in *State v. Rayton*, 268 Kan. 711, 723, 1 P.3d 854 (2000), where the *Rayton* court held that conflicting evidence as to whether the defendant or his brother fired the gunshots did not create any doubt that the underlying felony of discharging a firearm at an occupied dwelling had been committed; thus, the defendant was not entitled to instructions on lesser included offenses of felony murder. In rejecting the defendant's argument that the evidence as to who committed the underlying felony was conflicting, the court noted: "Rayton misconstrues the rule. The rule pertains to evidence that the underlying felony was committed. In this case, there is no doubt that an underlying felony was committed. Therefore, if the jury believed that Rayton committed the underlying felony, Rayton was guilty of felony murder." 268 Kan. at 723.

Thus, the rule that a trial court is required to instruct on lesser included offenses of felony murder only when the evidence of the underlying felony is weak, inconclusive, or conflicting does not pertain to evidence about who committed the underlying felony. The rule pertains to evidence that the underlying felony was committed.

In this case, there was no doubt that the underlying felony of abuse of a child was committed. The evidence showed beyond any doubt that Brian Edgar was bound with duct tape like a mummy, his mouth blocked with a foreign object, and there were ligature marks on his wrists and ankles; these facts were strong evidence of

the intentional infliction of cruel and inhuman bodily punishment on a child. See K.S.A. 21-3609. The only question was who was responsible for the taping of Brian on the night in question. If the jury believed that Boyd committed or aided and abetted in the underlying felony of abuse of child, she was guilty of felony murder.

The trial court did not err in refusing to give lesser included offense instructions on the felony-murder count.

### B. Abuse of a Child

With regard to the requested instructions for lesser included offenses of abuse of a child, a different rule applies:

"A trial court must instruct the jury on a lesser included offense 'where there is some evidence which would reasonably justify a conviction' of the lesser offense. [Citation omitted.] 'If the defendant requests the instructions, the trial court has a duty to instruct the jury regarding all lesser included crimes that are established by the evidence, regardless of whether the evidence is weak or inconclusive.' [Citation omitted.] On review, the appellate court views the evidence in the light most favorable to the defendant. [Citation omitted.] 'However, the duty to so instruct arises only where there is evidence supporting the lesser crime.' [Citation omitted.] An instruction on a lesser included offense is not required if the jury could not reasonably convict the defendant of the lesser included offense based on the evidence presented. [Citation omitted.]" *State v. Drennan*, 278 Kan. 704, 712-13, 101 P.3d 1218 (2004).

See K.S.A. 2004 Supp. 22-3414(3).

Boyd requested jury instructions on endangering a child, K.S.A. 21-3608, and criminal restraint, K.S.A. 21-3424, both class A misdemeanors, as lesser included offenses of abuse of a child, K.S.A. 21-3609, a severity level 5 felony. However, on appeal, Boyd only argues that the trial court should have instructed the jury on endangering a child.

K.S.A. 2004 Supp. 21-3107(2) defines a lesser included crime as:

"(a) A lesser degree of the same crime;
"(b) a crime where all elements of the lesser crime are identical to some of the elements of the crime charged;
"(c) an attempt to commit the crime charged; or
"(d) an attempt to commit a crime defined under subsection (2)(a) or (2)(b)."

Boyd does not argue that endangering a child is a lesser included offense of child abuse under an elements test. Rather, she contends that endangering a child and abuse of a child are differing degrees of the same crime. According to Boyd, the former prohibits placing a child in a situation where the child could be injured and the latter prohibits actually causing such injury. Thus, Boyd contends endangering a child is a lesser degree of the same crime as abuse of a child and is a lesser included crime pursuant to K.S.A. 2004 Supp. 21-3107(2)(a).

Abuse of a child, as defined in K.S.A. 21-3609, is "intentionally torturing, cruelly beating, shaking which results in great bodily harm or inflicting cruel and inhuman corporal punishment upon any child under the age of 18 years." Endangering a child, as defined in K.S.A. 21-3608(a), is "intentionally and unreasonably causing or permitting a child under the age of 18 years to be placed in a situation in which the child's life, body or health may be injured or endangered." The only commonality of elements between child abuse and endangering a child is the age of the victim. Otherwise, the two crimes share no elements and are not merely different degrees of the same crime.

This court has held that theft is a lesser degree of larceny than robbery (*State v. Long*, 234 Kan. 580, 592, 675 P.2d 832 [1984], *disapproved in part on other grounds State v. Keeler,* 238 Kan. 356, Syl. ¶ 8, 710 P.2d 1279 [1989]) and that manslaughter is a lesser degree of homicide than murder (*State v. Gregory*, 218 Kan. 180, 183, 542 P.2d 1051 [1975]). Both of these examples involve a generic crime—larceny or homicide. There is no single generic crime that can be said to encompass both endangering and abusing a child. They are separate and distinct crimes with different elements and are not different degrees of a generic crime.

Endangering a child, as defined in K.S.A. 21-3608, is not a lesser degree of the crime of child abuse, as defined in K.S.A. 21-3609, pursuant to K.S.A. 2004 Supp. 21-3107(2). Therefore, the trial court did not err in refusing to instruct the jury on endangering a child as a lesser included offense of child abuse.

## III. Evidence of Other Acts of Binding or Restraining Children

Finally, Boyd argues that the trial court erred in admitting, over her objection, the testimony of Chauntel Williams that Christy would direct caretakers to tape or tie up the children and that Williams had witnessed this at 1014 Greeley, an address different from the Johnson County house where the Edgars lived at the time of the offenses at issue in this case. Williams did not specifically identify Boyd as one of those caretakers.

When examining the admission or exclusion of evidence, the first question is relevance. "Once relevance is established, evidentiary rules governing admission or exclusion of evidence may be applied either as a matter of law or in the exercise of the trial court's discretion, depending upon the contours of the rule in question." *Carter*, 278 Kan. at 77.

Boyd's argument that the evidence was inadmissible is misplaced because Williams never identified Boyd as one of the caretakers who was directed to tape or tie up the children at the Greeley address. Williams' testimony is more accurately characterized as evidence against Christy and Neil, and previous cases hold that such evidence is admissible independent of K.S.A. 60-455 as evidence of a prior pattern of discipline. See *State v. Carr*, 265 Kan. 608, 624-25, 963 P.2d 421 (1998) (evidence of defendant's prior discipline of her children relevant and admissible independent of K.S.A. 60-455 to establish pattern of discipline).

Furthermore, Boyd did not have a valid objection under K.S.A. 60-455 since the evidence did not identify her. This is illustrated by *State v. Harris*, 259 Kan. 689, Syl. ¶ 3, 915 P.2d 758 (1996). In *Harris*, the defendant complained of the admission of a statement indicating that some members of his gang, the Vice Lords, had previously threatened police officers. First, this court explained that K.S.A. 60-455 did not apply:

"The purpose of K.S.A. 60-455 is to forbid introduction of crimes or civil wrongs committed by the defendant in a criminal action or party in a civil action for the purpose of showing disposition to commit crime or civil wrong. In a criminal action, *K.S.A. 60-455 applies only to the acts of the defendant.*" (Emphasis added.) 259 Kan. 689, Syl. ¶ 3.

As such, the evidence was not inadmissible under K.S.A. 60-455. This court stated:

"Although the statement indicated that some members of the Vice Lords had previously threatened officers, there was no evidence that the defendant himself had ever threatened officers. The purpose of K.S.A. 60-455 is to forbid introduction or crimes or civil wrongs committed by the defendant in a criminal action or party in a civil action for the purpose of showing the party's disposition to commit a crime or civil wrong. In a criminal action, it applies only to the defendant. [Citation omitted.] In this case, the prior actions of the Vice Lords are not the actions of the defendant, and the evidence was properly admissible independent of K.S.A. 60-455." 259 Kan. at 702.

Similarly, in this case, the prior actions of Christy and other caretakers were not the actions of Boyd; therefore, K.S.A. 60-455 did not operate to exclude Williams' testimony.

Affirmed.