NOT DESIGNATED FOR PUBLICATION

No. 121,915

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MIGUEL ALBERT,
*Appellant*.


MEMORANDUM OPINION

Appeal from Wyandotte District Court; WESLEY K. GRIFFIN, judge. Opinion filed March 26, 2021. Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Taylor A. Hines*, assistant district attorney, *Mark A. Dupree Sr.*, district attorney, and *Derek Schmidt*, attorney general, for appellee.


Before HILL, P.J., GARDNER, J., and BURGESS, S.J.

PER CURIAM: Miguel Albert and John Smith, both of whom have at least one child with Chantel Drayton, got into an argument in September 2017, which resulted in Albert shooting Smith. The argument stemmed from what Smith perceived as inappropriate actions while his child was present when Drayton and Albert were exchanging their two children for visitation purposes. The State charged Albert with one count each of aggravated assault and aggravated battery, and the jury found him guilty on both counts at the conclusion of his trial. Albert appeals, arguing that there was insufficient evidence to convict him of aggravated assault, that the district court erred when it failed to give an

1

instruction for simple battery, and that the district court erred when it did not admit a business record during trial. Finding no error, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

At one time, Drayton and Albert were in a relationship and had two children together. But by September 2017, they were no longer in a relationship but shared custody of their two minor children, and Drayton and Smith had a daughter and were living together.

On September 17, Smith and Drayton got into an argument while in Smith's vehicle, with all three children in the backseat. During the course of the argument, the car was stopped on the side of the road, and both Smith and Drayton exited the car. At one point, all three children were removed from the backseat and then returned to the car. Smith and Drayton both got back in the car, and Smith continued to drive. Frustrated by the events, Smith again stopped the car, got out to walk home, and left Drayton to drive the vehicle with the three children in the backseat.

After the argument Drayton called Albert, and they planned to meet at a Taco Bell so they could exchange their two children. During the phone call, Drayton explained to Albert the argument she had with Smith, and Albert was apparently so concerned that he decided to call the police. Albert arrived at the Taco Bell first, and Drayton arrived before the police did. Drayton told Albert what had happened between her and Smith, and Albert responded by taking all three children out of the car, including Drayton and Smith's child. Drayton repeatedly asked Albert to give her and Smith's child back, but Albert refused until the police directed him to do so. Drayton later told Smith about what occurred at the Taco Bell, and she said that he was upset about Albert taking Drayton and Smith's child away from her.

On September 24 around 10 p.m., Drayton received a call from Albert while she was driving Smith to work, with their daughter in the backseat, and Albert told Drayton that he would meet her at her house to drop off their two children. Drayton turned around and drove back to the house. Albert arrived at the house first and parked on the street in front of the house. When Drayton arrived, she parked in the driveway.

After Drayton parked, Smith exited the vehicle and approached Albert's vehicle to confront him about what happened on September 17. When he reached the driver's side door of Albert's vehicle, Smith said he "opened the door and tugged at [Albert's] shirt, or maybe grabbed his shirt, and honestly, it was nothing I'd say violent or anything like that, but I was definitely—I definitely wanted him to know that—to leave my daughter alone." Smith believed he grabbed Albert around his upper collar and said his intent was to look Albert in the face and tell him to leave his daughter alone. After he conveyed his message, Smith turned around and walked back to the driveway where Drayton was parked.

Once Smith got to the driveway, he turned around and noticed that Albert was not far behind him. At that point, Drayton was in the process of buckling her and Albert's two children in the backseat of the vehicle. When Albert reached the driveway, he and Drayton engaged in a conversation about what happened a week earlier. Smith said the conversation was primarily between Drayton and Albert, but he would occasionally say something as well. During the conversation, Smith noticed that Albert kept reaching for something in his waistband area. Smith then approached Albert to the point of being about an arm's length away, pulled Albert's shirt open, and realized Albert was carrying a firearm.

Smith responded to the realization by asking Albert "something to the effect of really or might have been something like really, Bro, for real?" Smith said he was close

3

enough that Albert could have inflicted bodily harm if Albert wanted to, but Smith was more in disbelief that Albert was carrying a firearm. Despite the fact Smith was unarmed, Albert stepped away from Smith, pulled out the gun, and pointed it at him. Smith asked if Albert was going to shoot him, but Albert did not say anything before shooting Smith with the firearm.

Drayton's account of the events on September 24 largely corroborated Smith's version. Drayton said that after she parked, she exited the vehicle and went to the back door of the driver's side of Albert's vehicle to get her two children. While in the process of unbuckling and moving the children between vehicles, she heard Smith and Albert talking about what happened on September 17. The children were frightened at the time because Smith and Albert's voices were raised, but she did not see Smith attempt to hit or strike Albert while they spoke at Albert's driver's side door. Eventually, all three parties were in the driveway talking for a few minutes about what happened a week earlier. During the conversation, Drayton turned to tend to her children in the backseat. While she was doing so, Albert shot Smith.

Albert's girlfriend, Janaisha Black, testified differently from Smith and Drayton. Black, who was in the passenger seat of Albert's vehicle, said that Smith opened Albert's door and started choking Albert, causing Black to be pushed up against the passenger side door. Smith eventually stopped choking Albert, and Albert got out of the car and spoke with Drayton and Smith. Black, who remained inside the vehicle while the other three were speaking, said she saw Smith try to lunge and attack Albert, and Albert shot Smith in response.

Albert testified that Smith opened his door, threatened him, and immediately started choking him. Based on Smith's actions, Albert said he feared for his life. Later, when he, Drayton, and Smith were talking near the driveway, Albert stated that he asked Smith multiple times what the problem was, but Smith never responded to his questions.

4

Instead, when Drayton was buckling the children in Smith's car, Smith attempted to lunge at Albert, and Albert shot Smith in self-defense. Albert said he shot Smith "below the waist in the leg just to try to get him off of me."

According to medical records from the University of Kansas Hospital, the bullet went through Smith's right hand, his abdomen, and his bladder before ultimately ending up in his posterior. He had to have two surgeries, one for the wound to his abdomen and a second to remove the bullet from his posterior. Though there were complications during the recovery process, Smith physically recovered from his wounds.

A few days after the incident, the State charged Albert with one count of aggravated battery, but the complaint was later amended and Albert was charged with one count each of aggravated battery and aggravated assault. At the conclusion of the trial in May 2019, the jury found Albert guilty of both aggravated battery and aggravated assault.

Later that month, Albert filed a motion for judgment of acquittal or, alternatively, a motion for a new trial. Albert argued the district court should acquit him of aggravated assault because there was insufficient evidence Smith was in reasonable apprehension of immediate bodily harm, which is the first element of aggravated assault. Albert also argued that his convictions for aggravated assault and aggravated battery were multiplicitous. Furthermore, he believed the district court erred when it did not grant a mistrial after the prosecutor allegedly committed prosecutorial error. Lastly, he contended the district court erred when reading back only a portion of Albert's testimony after the jury asked for clarification during deliberations. The State later responded and opposed Albert's motion.

Albert also filed a motion for a dispositional departure. He maintained Smith was the initial aggressor in the altercation. He argued that he supported his three minor

children, he lacked a criminal record, and he had full-time employment, all of which weighed in favor of placing him on probation and ordering him to complete an anger management program instead of sending him to prison. The State never filed a written response to Albert's motion for a dispositional departure but argued against it when the district court held the sentencing hearing.

At the hearing, Albert abandoned the multiplicity issue, agreeing with the State that the case he relied on was no longer good law. After hearing Albert's arguments in support of his motions, the district court rejected Albert's motion for judgment of acquittal. The district court also rejected his motion for dispositional departure and sentenced him to the standard term for both counts, which was 12 months' imprisonment for each count, to run concurrently.

Albert timely appeals.

ANALYSIS

*There was sufficient evidence to convict Albert of aggravated assault.*

On appeal, Albert again contends there was insufficient evidence to convict him of aggravated assault based on a lack of evidence regarding him placing Smith in reasonable apprehension.

> "'When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.' [Citation omitted.]" *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018).

6

Assault is defined as "knowingly placing another person in reasonable apprehension of immediate bodily harm." K.S.A. 2017 Supp. 21-5412(a). Aggravated assault under K.S.A. 2017 Supp. 21-5412(b)(1) has the same elements as assault with the additional element that the assault be committed with a deadly weapon. Albert does not contest that the firearm used constitutes a deadly weapon. He only argues there was insufficient evidence that he placed Smith in reasonable apprehension of immediate bodily harm.

Looking at the evidence in the light most favorable to the State, Smith testified during trial that he was in disbelief after discovering Albert had a gun when the two were talking in the driveway. After making the discovery, Albert took out the weapon and pointed it at Smith, and Smith asked Albert multiple times if he was planning on shooting him, to which Albert never responded. Eventually, Smith said he went from asking Albert whether he was going to shoot him to placing his hands over his stomach just before Albert fired the weapon. Smith described what he did as a reaction because he had an inclination that something bad was about to happen. Albert argues Smith never testified that he feared for his well-being. Instead, "the prosecutor's case for reasonable apprehension relies upon a look on Miguel's face and Mr. Smith interpreting that look to mean something would happen."

In *State v. Brown*, 300 Kan. 565, 584, 331 P.3d 797 (2014), our Supreme Court found that reasonable apprehension can be established by circumstantial evidence. See also *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016) (noting that a conviction of even the gravest offense can be based entirely on circumstantial evidence). In *Brown*, the defendant and his cousin went to the apartment of Otis Bolden, a man they believed had previously sexually assaulted his cousin's girlfriend. When Brown and his cousin entered Bolden's apartment, Ashley Green was in the living room, and they directed her at gunpoint to lie on the ground and give them Bolden's location. Green initially believed the men were Bolden's friends that were playing a joke on him, but she was still afraid

7

and felt threatened by the cousins' actions. Shortly thereafter, Brown and his cousin went to the bedroom where Green directed them and shot and killed Bolden. Brown was convicted of numerous charges, including aggravated assault for his actions against Green.

Based on some inconsistent testimony from Green about her reasonable apprehension of immediate bodily harm, Brown argued on appeal he was entitled to relief based on *State v. Warbritton*, 215 Kan. 534, 537-38, 527 P.2d 1050 (1974). In *Warbritton*, the alleged victim specifically stated she was not in immediate apprehension of bodily harm. In reaching its conclusion in *Brown*, our Supreme Court stated that "[u]nlike in *Warbritton*, we are not faced with unequivocal testimony that [the victim] was not afraid for herself." *Brown*, 300 Kan. at 584. Our Supreme Court also noted that Green's immediate compliance with Brown's demands supported a logical inference that she was "motivated by a fear of bodily harm." 300 Kan. at 584; see *State v. Nelson*, 224 Kan. 95, 96, 577 P.2d 1178 (1978) (noting that a victim's fear of bodily harm can be established by circumstantial evidence).

Here, circumstantial evidence establishes that Smith was placed in reasonable apprehension of immediate bodily harm. Albert did not respond to Smith's comments and questions, specifically whether Albert was going to shoot. Albert first displayed the gun in his waistband and then aimed it directly at Smith from a short distance. At this point Smith stated he felt something bad was about to happen. As a result, Smith attempted to protect himself as much as possible by placing his arms in front of his body where the gun was aimed. A very reasonable conclusion would be that Smith was acting out of fear of being shot.

Based on the testimony, the jury convicted Albert of aggravated assault. Looking at the evidence in the light most favorable to the prosecution, a reasonable person could have concluded beyond a reasonable doubt that Albert placed Smith in reasonable

apprehension of bodily harm. Accordingly, the record contains sufficient evidence to convict Albert of aggravated assault under K.S.A. 2017 Supp. 21-5412(b)(1). See *Chandler*, 307 Kan. at 668.

*The district court did not err when it failed to give a jury instruction for simple battery.*

Albert argues the district court erred when it failed to give an instruction for simple battery.

"When analyzing jury instruction issues, we follow a three-step process: '(1) determining whether the appellate court can or should review the issue, *i.e.*, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, *i.e.*, whether the error can be deemed harmless.' [Citation omitted.]" *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018).

There is no dispute Albert requested an instruction on simple battery during the jury instruction conference. Albert has preserved the issue for appellate review. See K.S.A. 2020 Supp. 22-3414(3).

As to the second step in the analysis, appellate courts consider whether the "'instruction was legally and factually appropriate, employing an unlimited review of the entire record.'" *McLinn*, 307 Kan. at 318 (quoting *State v. Williams*, 295 Kan. 506, Syl. ¶ 4, 286 P.3d 195 [2012]). As both parties acknowledge, an instruction for simple battery was legally appropriate because simple battery is a lesser included offense of aggravated battery, which is what the jury convicted Albert of. See K.S.A. 2017 Supp. 21-5413(b)(1)(B), (g)(2)(B); see also *State v. Simmons*, 295 Kan. 171, 175, 283 P.3d 212 (2012) (finding that simple battery is a lesser included offense of aggravated battery). The only remaining question is whether such instruction was factually appropriate.

9

Albert argues the district court erred because it has a duty to instruct a jury on lesser included crimes "where there is some evidence which would reasonably justify a conviction" on the lesser included crime. K.S.A. 2020 Supp. 22-3414(3). Albert contends that, looking at the evidence in the light most favorable to him, there was evidence to support a conviction of simple battery. See *McLinn*, 307 Kan. at 325. Albert also points out that the district court's duty exists regardless of whether the evidence is weak or inconclusive because it is a jury's decision whether the evidence established the difference between harm and great bodily harm. See *Simmons*, 295 Kan. at 177; see also *State v. Boyd*, 281 Kan. 70, 93, 127 P.3d 998 (2006).

Here, the district court made the determination that simple battery was not an appropriate instruction, but it did conclude that other lesser included versions of aggravated battery were appropriate. This included K.S.A. 2017 Supp. 21-5413(b)(1)(B), which is what the jury ultimately convicted Albert of. The district court based its conclusions on the fact that Smith was shot with a deadly weapon. The district court went on to say that "this is not like a broken arm done by a hit or something where a jury could find that a broken arm or broken nose is simple battery."

The facts clearly show that Albert used a gun to shoot Smith. This court has previously stated that "[t]he difference between battery and aggravated battery is the inclusion in the latter crime of the additional element that the act is performed 'with a deadly weapon.'" *State v. Smith*, 39 Kan. App. 2d 64, 69, 176 P.3d 997 (2008). Moreover, the facts show that Smith's injuries were not "slight, trivial, moderate, or minor." See *State v. Brice*, 276 Kan. 758, 774, 80 P.3d 1113 (2003). Based on this, the district court was not required to give an instruction on simple battery. *Boyd*, 281 Kan. at 93. The district court did not err when it failed to give an instruction on simple battery, and we affirm Albert's conviction.

*Any error for the failure to admit a business record is harmless.*

At trial, Albert sought to introduce medical records from the jail showing scratches on his neck to support his theory of defense. The district judge asked the State if it would acquiesce to the records being admitted, and the State replied that it would "stipulate to the foundation of it as far as custodian of records is concerned. My next sentence was I will likely object for other reasons, but no need to get a custodian." The parties continued to discuss the admissibility of the medical records, but no conclusion was made at that time. When Albert sought to introduce the records later, the district court did not allow him to do so, and Albert objected. The issue is properly preserved for appellate review. See K.S.A. 60-405; see also *State v. Davis*, 312 Kan. 259, 279, 474 P.3d 722, 739 (2020).

Both parties agree the issue involves an exception to the hearsay rule. "The admissibility of evidence under an exception to the hearsay rule is reviewed for abuse of discretion." *State v. Seacat*, 303 Kan. 622, 634, 366 P.3d 208 (2016). A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. 303 Kan. at 634-35. Albert contends the district court's ruling was based on an error of law.

"K.S.A. [2020] Supp. 60-460 is an exclusionary rule; it forbids hearsay evidence, subject to certain enumerated exceptions." 303 Kan. at 631. Hearsay is defined as "[e]vidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated." K.S.A. 2020 Supp. 60-460. Such evidence is inadmissible unless it fits within an exception to the rule. One such exception is the business records exception, which states:

> "Writings offered as memoranda or records of acts, conditions or events to prove the facts stated therein, if the judge finds that: (1) They were made in the regular course

11

of a business at or about the time of the act, condition or event recorded; and (2) the sources of information from which made and the method and circumstances of their preparation were such as to indicate their trustworthiness.

"If the procedure specified by K.S.A. 60-245a(b), and amendments thereto, for providing business records has been complied with and no party has required the personal attendance of a custodian of the records or the production of the original records, the affidavit or declaration of the custodian shall be prima facie evidence that the records satisfy the requirements of this subsection." K.S.A. 2020 Supp. 60-460(m).

In *State v. Davis*, 2 Kan. App. 2d 698, 699, 587 P.2d 3 (1978), this court stated:

"Assuming appropriate foundation for admission of all or part of the hospital record in this case, the problem is that double hearsay is involved. The proffered evidence constitutes hearsay statements of hospital personnel reporting statements of the defendant. It was offered to prove the truth of such included statements. The business records exception, K.S.A. 60-460(M), renders admissible hearsay statements of hospital personnel but does not render admissible included hearsay statements absent admissibility of the included statements under some other exception to the rule."

Albert points out that the State stipulated to the foundation of the record and argues that "the record in question did not involve statements of persons other than the author of the record, which was the dispositive fact in *Davis*." The State, however, contends that the statements within the record constituted multiple levels of hearsay. It argues that "although the jail intake record itself satisfied a hearsay exception, the statements within the business record did not" because Albert failed to establish an independent basis for the admissibility of the statements. See 2 Kan. App. 2d at 699.

Albert is correct that the State stipulated to the foundation of the record, "as far as the custodian of the records is concerned." The State also did not take issue with the source of the information, stating that the record was "very clearly an official Wyandotte

12

County intake form." See K.S.A. 2020 Supp. 60-460(m). However, after agreeing the statement contained in the record was the assessment of a medical professional, the State took issue with the fact it would not be able to cross-examine the witness who made the statement.

When Albert attempted to admit the record during trial, the district court stated:

"And there's a way to get a business record for what it is into evidence and this is not that way. You're asking for hearsay answers on a blank—couple blanks by somebody else who is not in this court. [The State] didn't stipulate to that, somebody else who wrote those things. [The State is] stipulating that [they] didn't need the recording of all the records say, the person over there says, yeah, this is a record. [The State] did not stipulate to what somebody else, a third party, wrote.

. . . .

". . . Let's say it is in the record, how does [the State] cross-examine that? There's a proper way to do it and this is not the proper way."

The issue is distinguishable from the one in *Davis* because here, the statements Albert sought to introduce were not statements of medical personnel reporting the defendant's statements. See 2 Kan. App. 2d at 699. Later in the *Davis* opinion this court stated that the "[d]efendant's reliance upon *In re Estate of Bernatzki*, 204 Kan. 131, 134-135, 460 P.2d 527 (1969), is misplaced. Bernatzki, held medical records admissible under K.S.A. 60-460(M). The statements there at issue were of the entrants, hospital personnel, not a third party declarant." *Davis*, 2 Kan. App. 2d at 699-700. Here, the record apparently contained statements made from Albert, including "patient verbalizes neck being sore from prior altercation with mother of children's boyfriend. It does say scratches noted and no signs of distress." However, Albert made it clear that he was specifically interested in paragraph 22, where the individual described their observation that Albert had scratches on his neck and arms.

13

Since the State stipulated to the custodian of the records and did not take issue with the source of the information, the district court might have erred when it did not admit at least part of the record during trial. However, any error is moot when analyzed for harmless error. See *State v. Williams*, 306 Kan. 175, 202-03, 392 P.3d 1267 (2017).

Our Supreme Court has "'previously recognized that under the state and federal Constitutions a defendant is entitled to present the theory of his or her defense and that the exclusion of evidence that is an *integral* part of that theory violates a defendant's fundamental right to a fair trial.'" *State v. Stano*, 284 Kan. 126, 131, 159 P.3d 931 (2007). Thus, this court must assess whether the error was harmless under the federal constitutional harmless error standard of *Chapman v. California*, 386 U.S. 18, 23-24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967): whether the party benefiting from the error proves beyond a reasonable doubt that the error would not or did not affect the outcome of the trial in light of the entire record. See *Williams*, 306 Kan. at 202-03.

"To prevent reversal, the State, as the party benefiting from the error, must prove that 'there is no reasonable possibility that the error contributed to the verdict.'" 306 Kan. at 203 (quoting *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 [2011]). To meet this burden, the State relies on the cumulative testimony from other witnesses that all testified to seeing scratches on Albert's neck.

Black testified that Smith opened Albert's driver side door and started choking him. Albert also testified, and corroborated Black's version of the events, that Smith opened his door, threatened to kill him, and started strangling him. Irma Arthur testified that she saw Albert after he was released from jail and noticed that he had scratch marks on his neck. Similarly, Tabitha Albert, the defendant's sister, testified that when she picked Albert up from jail, she saw "scratches on his neck on both sides and they were very visible even though he was there a few days, but it was already, you know, starting to heal a little bit, but the marks were right there on his skin under his neck."

14

The testimony Albert sought to admit through the business record was admitted from multiple other sources during trial. The State proved beyond a reasonable doubt that the error did not contribute to the verdict. See *Williams*, 306 Kan. at 202-03.

Affirmed.