NOT DESIGNATED FOR PUBLICATION

No. 126,590

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

RAMONE SINGLETON,
*Appellant*.


MEMORANDUM OPINION

Appeal from Douglas District Court; SALLY D. POKORNY, judge. Submitted without oral argument. Opinion filed October 25, 2024. Affirmed.

*Joseph A. Desch*, of Law Office of Joseph A. Desch, of Topeka, for appellant.

*Jon Simpson*, senior assistant district attorney, *Suzanne Valdez*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.


Before MALONE, P.J., GREEN and SCHROEDER, JJ.


PER CURIAM: Ramone Singleton appeals his convictions for voluntary manslaughter, in violation of K.S.A. 21-5404, aggravated battery, in violation of K.S.A. 21-5413(b)(1)(A), and aggravated assault, in violation of K.S.A. 21-5412(b)(1). Singleton argues that the district court erred in consolidating cases with two separately charged defendants. Singleton also argues that the evidence at trial was insufficient to convict him of any of the charged offenses. Because the district court did not err in consolidating and because the evidence was sufficient, we affirm Singleton's convictions.

1

Due to the joint trial, the facts here are identical to the facts set out in *State v. Carvin*, No. 121,448, 2021 WL 1324030 (Kan. App. 2021) (unpublished opinion):

"This case stems from a shooting at the Motel 6 in Lawrence that involved two groups of men. Cameron Hooks, Laroyce Thomas, and Dominick Frye suffered gunshot wounds while their friends Tanner Marlowe and Mathdaniel Squirrel avoided being shot. The identities of the other four men in the motel room were originally unknown. The Lawrence Police Department (LPD) undertook an extensive investigation and the State ultimately prosecuted three individuals for crimes related to the shooting: Carvin, Shawn Smith, and Ramone Singleton. The fourth man in the second group was later identified as SirEric Singleton (SirEric), Ramone's brother.

"Carvin and Squirrel first met in 2016 in a juvenile correction center, and they remained friends and stayed in touch after their release. In July or August 2017, Squirrel brought Marlowe and Frye to Carvin's home in Kansas City, Kansas, and they all sat on the front porch and talked for about 30 minutes. Carvin had a friend there as well; he later stated he could not remember who it was, but Marlowe later identified that friend as Singleton. Frye showed Carvin a silver and black 9 mm Ruger he was trying to sell. According to Carvin, he agreed to buy it and they exchanged phone numbers.

"Carvin later said that he went to Topeka and met with Frye to buy the gun, but Frye did not have the gun when Carvin arrived. Frye, on the other hand, said that Carvin texted him after they first met about buying the gun, but Frye never replied to the texts. In any event, that encounter was friendly.

"On September 2, 2017, Frye, Squirrel, and Marlowe drove to Kansas City and went shopping. They then drove to Lawrence, where they planned to go to bars and a strip club. Frye rented a room on the third floor at the Motel 6 in Lawrence, which is near Interstate 70. At about 7 or 8 p.m., they drove to Walmart, where they did some more shopping and met up with Thomas and Hooks. After they left Walmart, the men stopped at a liquor store, then headed back to the Motel 6.

"Carvin later testified that at 9 or 10 p.m., he realized he had a Snapchat message from Squirrel inviting him to a strip club and saying Squirrel had a hotel room. Squirrel later testified that he had posted on Snapchat that he was in Lawrence and Carvin asked if he could join them. Carvin said he told Squirrel he was bringing his cousin, but Squirrel later said he did not know Carvin was bringing anyone with him. Either way, Carvin, Singleton, Smith, and SirEric headed to the motel.

"*Carvin's version of events*

"Carvin testified that when he, Singleton, Smith, and SirEric arrived at the Motel 6, Squirrel met them in the motel parking lot. Carvin introduced Squirrel to the others and they went inside. Once in the room, Carvin recognized Marlowe and Frye but he did not know Thomas or Hooks and had not anticipated they would be there. The gun Frye had been trying to sell him was sitting on the dresser in front of the television, and Carvin saw that Thomas had a black gun on his waist. Carvin saw a third gun, a black semiautomatic .380, sitting on the table. At one point, Frye asked if Carvin still wanted to buy his gun and when Carvin said he did, Frye said he would sell it to him at the end of the night. Frye passed the gun around the room, compared it with Thomas' gun, which Thomas had taken out, and then set it on the side of the bed. Carvin also saw a fourth gun in the room, near Marlowe, but Marlowe denied that it was his when Carvin asked him.

"Thomas and Squirrel ordered pizza and then the men all drank, smoked, ate pizza, and watched a game on television for about 20 to 30 minutes. Carvin sat on the corner of the bed closest to the bathroom with Marlowe, Smith, and SirEric. Frye and Singleton sat on the other bed and Thomas and Hooks were at the table. Carvin saw Squirrel talking with Hooks and Thomas, then Squirrel said he needed to get something out of the car and left the room. Right after that, Carvin heard someone get up and say, '"Run that shit."' Singleton stood up and, when Carvin peeked around Singleton, he saw Hooks and Thomas standing up and pointing guns at them.

"Carvin saw Singleton take off his necklace and begin to reach into his pocket, perhaps to give up his money. Carvin took off his watch to give to Hooks and Thomas as if it was a robbery. He heard either Hooks or Thomas say, '"Don't do it, don't do it, man."' Then Carvin felt a sharp pain in his arm and saw Singleton run past him and out of the

3

room, so he picked up a nearby gun and started shooting at Hooks and Thomas. He believed he shot four or five times, but he heard no gunshot, including his own, because his ears were ringing. Carvin was unsure whether any of his friends fired a gun, but he believed at the time that none of them had brought a gun to the room.

"As he ran out of the room, holding his phone and watch and still carrying the gun, Carvin tripped and fell, but he continued to fire the gun behind him as he left the room. Carvin believed that he was the only person shooting at that time. He left the motel through a back door and fell again as he crossed the parking lot, dropping his watch. Carvin tried to drop the gun as well, but he was physically unable to loosen his grip on it. When Carvin joined Smith, Singleton, and SirEric in the car, Singleton drove them away.

"*Frye's version of events*

"According to Frye, after he, Squirrel, Marlowe, Hooks, and Thomas returned from the liquor store, Squirrel said he had invited a friend from Kansas City to come join them. Frye ordered pizza and when Squirrel went down to get the pizza, he returned with four men, three of whom Frye later identified as Carvin, Singleton, and Smith. Frye had a gun in a waistband holster under his shirt and he believed Thomas had a gun as well. Frye noticed that none of the men from Kansas City seemed 'dressed to go out'; one of them was wearing Nike slide sandals. The men from Kansas City were quiet and looked around the room as they all ate pizza, drank liquor, smoked marijuana, and talked.

"According to Frye, just before the shooting, he was lying on the bed farthest from the door and closest to the window and Marlowe was sitting beside him. Hooks was walking to the refrigerator near the window. Thomas was at the refrigerator and Squirrel was pacing back and forth in front of both beds. Carvin, Smith, Singleton, and the fourth individual were sitting on the other bed in the room. Frye leaned over to pass a liquor bottle and he saw Carvin, Smith, Singleton, and the fourth individual 'hop up quick. And there was no words said, and then gunfire.' All four men from the Kansas City group had guns and '[t]wo of them was standing up on the bed, the other two was spraying.'

"Although Frye saw Carvin, Smith, Singleton, and the fourth individual pull out guns and he saw 'a few different flashes, so [he knew] a few different guns started going

4

off all at once,' he could not say exactly who fired. But according to Frye, neither he nor Thomas fired back. Instead, Frye rolled over on the bed, covered his head, and prayed. Before he did, he saw Marlowe fall off the bed and get behind and partially underneath it and he saw Hooks and Thomas 'trying to duck.' Squirrel was no longer in the room. Frye heard one of the men from the Kansas City group repeat the word '"go,"' and he heard the door to the room close, so he got up and locked the door. He heard Marlowe call 911 and saw Hooks 'coughing up chunks of blood.' Although he at first denied it to police, Frye threw his pistol out of the window. He also moved Hooks onto one of the beds.

"*Marlowe's version of events*

"Marlowe's version of events generally aligned with Frye's. Although he had met Carvin and Singleton before in Kansas City, he did not know their names when he saw them again on the night of the shooting. Marlowe testified at trial that everyone was in the motel room 'just hanging out' when the four men from Kansas City stood up and someone—he believed but was '[n]ot exactly sure' that it was one of the men from Kansas City—said, '"Run it. Run it,"' which Marlowe testified means '"give us all your shit."' In various statements to police officers and in his later trial testimony, however, Marlowe said that he also heard someone say, '"fuck you"' and that he remembered nothing being said before the shooting.

"When the shooting began, Marlowe dove off the bed onto the floor. Like Frye, Marlowe was not sure who had fired, but he believed at least most of the shots came from the group of men from Kansas City. But Marlowe conceded Thomas might have fired a gun although Marlowe did not see him do so. Marlowe did not have a gun and he did not know whether Hooks, Frye, or Squirrel did, but he knew that Thomas was armed.

"When the shooting stopped, Marlowe stood up and the men from Kansas City were gone, as was Squirrel. Thomas was on the floor by the table and Hooks and Frye were each on one of the beds. Although he at first lied to police about it, Marlowe eventually admitted that he then threw some marijuana out the window. He also saw Frye throw a gun out of the same window.

"*Squirrel's version of events*

"Squirrel met Carvin and his friends in the motel parking lot when they arrived, but he later testified that Carvin did not introduce his three companions and he had never met them before. Even so, the atmosphere was friendly, and everyone sat around the room, eating pizza, drinking, and smoking marijuana. Squirrel did not have a gun and he did not know whether Thomas, Marlowe, or Hooks had one. Squirrel knew that Frye had a gun, which he had placed on the table in the motel room. According to Squirrel, everyone's money and belongings were 'just sitting out'; he compared it to being at home and taking everything out of your pockets to relax.

"As they finished eating, Squirrel thought they were going to a nearby strip club, so he asked Frye, "'Are you ready?'" and Frye replied, "'Yes.'" Squirrel was going to wash his face at the sink near the door to the bathroom. Frye and Marlowe were on the bed in the corner, and Hooks and Thomas were near the window. One of the men from Kansas City came toward Squirrel with a gun and someone said, "'Give me everything" or "Run everything,'" but Squirrel did not know who spoke or whether it was one or two people. He only knew it was not Hooks' voice, Frye's voice, Thomas' voice, or Marlowe's voice, and it was not the man pointing a gun at him. Squirrel heard a gunshot, so he ducked, swatted away the gun pointed at him, and ran out of the motel room. Squirrel was not shot, and he eventually made his way to the ground floor and out of the motel.

"*Police investigation and arrests*

"Just after 11:30 p.m., Marlowe called 911 and reported that three people had been shot in room 308 of the Motel 6. When asked who had shot his friends, Marlowe told the dispatcher that he did not know their names, but they knew a friend of his. Another male who did not identify himself also called 911 and reported that he was at Motel 6 in Lawrence and had been shot. That caller repeatedly stated that he did not know who had shot him and, at about 2 1/2 minutes into the call, the caller stopped responding to the dispatcher's questions and the dispatcher ended the call.

"Many officers and detectives from the LPD responded to the motel. Officers found Thomas lying on the floor in the entryway being tended to by a woman—another

6

guest at the motel—who had put a tourniquet on a gunshot wound to his leg. Marlowe, who was standing near the room's window talking on the phone with the 911 dispatcher, said he was not hurt. Hooks and Frye were lying on the beds in the room, and the responding officers began applying pressure to their gunshot wounds. Frye had suffered four gunshot wounds: one on each of his legs, one near his spine, and one in his left buttock. Two bullets remained in his body, one in his back and one in his buttock. Still, Frye gave physical descriptions of men who had come from Kansas City to party with them whom Frye said had suddenly begun shooting. Frye also said that the men were wearing dark clothing and were driving a dark-colored Grand Prix. Frye said he had met them before at parties, but he did not know their names.

"Hooks had been shot five times; each bullet had entered and exited his body. One bullet entered Hooks' left lower back, passed above his left kidney, went through his liver and diaphragm, and exited through his chest wall below his right nipple. Another bullet entered the back of Hooks' left forearm and exited through the front of his forearm. A third and a fourth bullet entered the left side of Hooks' back a bit above his waistline and exited through his abdominal wall. The fifth bullet entered the outside of Hooks' left thigh and exited the inside of his left thigh. Hooks, who was in and out of consciousness, also told police he did not know who the shooters were or why they had shot him.

"When a detective asked Thomas who had shot him, Thomas said a 'black male,' but he did not know the man's name. Detective Kimberlee Nicholson, who would become the lead detective for the case, also asked each man who had been shooting. Thomas, Frye, and Hooks each said they did not know; Marlowe said it was four black men from Kansas City who were headed back to Kansas City.

"Meanwhile, as they were driving down the highway away from Lawrence, Singleton helped Carvin loosen his grip on the gun he had fired and, at Carvin's direction, Singleton threw the gun out the window. SirEric and Singleton each threw their own guns out the window as well. According to Carvin, this was the first point at which he realized Singleton and SirEric had guns. Carvin told Singleton to take him to the hospital at the University of Kansas Medical Center (KU Med). They did not have enough gas to make it, so Singleton called his mother, Kiana Jones, who met them in Kansas City and took Carvin to KU Med. SirEric rode with Carvin and Jones, but when they got to KU Med,

7

only Carvin and Jones went inside. At KU Med, Carvin told Kansas City, Kansas police officers that he had been shot at 18th Street and Parallel in Kansas City, Kansas.

"Back at the motel in Lawrence, Thomas left in an ambulance headed for KU Med to get further treatment. Frye was taken by ambulance to Stormont-Vail hospital in Topeka. Hooks was taken by ambulance to the Lawrence Municipal Airport to meet a Life Star helicopter, but he died on the way. After a later autopsy, Dr. Erik Mitchell, forensic pathologist and the Douglas County Coroner, concluded that Hooks' cause of death was multiple gunshot wounds, the mechanism of death was bleeding and internal blood loss, and the manner of death was homicide.

"When law enforcement went to KU Med to interview Thomas, they learned that Carvin had been admitted with a gunshot wound as well. Although they did not think then that Carvin was involved in the Lawrence shooting, they took Carvin's picture and sent it to the detectives who were interviewing the other victims. Frye identified Carvin as one of the individuals who had shot him. Squirrel also identified Carvin as having been in the motel room.

"Officers at the motel searched the parking lot and found a silver semiautomatic handgun, a black handgun, a bag of marijuana with the end torn off, and what looked like a blunt. They also found blood near the southeast corner of the motel and a blood trail between the motel's eastern door and the third floor. Crime scene technician Jana Ramsey collected the items from the parking lot, as well as a broken watch that Carvin later said was his. Inside the motel room, Ramsey collected 22 cartridge cases and 13 projectiles. There were more than 25 bullet holes in the motel room. Ten or 11 of the bullet holes were in the back wall of the room, which was the south wall, and Detective Zacharia Thomas determined that the bullets fired in the room generally traveled north to south.

"The manager of the Motel 6 gave police access to the motel's surveillance camera footage. Detective M.T. Brown took the footage downloaded from the motel surveillance cameras and excerpted the relevant video, linking it into a linear video of the events as they happened and as they were picked up by the security cameras in hallways, in the lobby, and on the motel's exterior.

"Through an intensive investigation that need not be detailed for purposes of this appeal, police focused on Carvin, Singleton, and Smith as suspects. Carvin was arrested on September 5, 2017. Smith was arrested on September 15, 2017, and Singleton was arrested on September 27, 2017. The State ultimately charged Carvin with the first-degree murder of Hooks under alternative theories of felony murder committed during the commission of aggravated robbery and intentional premeditated murder; one count of aggravated battery of Frye; one count of aggravated assault of Marlowe; and one count of attempted aggravated robbery or, in the alternative, aggravated assault of Squirrel. Carvin, Singleton, and Smith—who were charged with similar crimes—were tried at a single jury trial that began on August 13, 2018.

"*Trial evidence*

"During the trial, the State presented testimony from the dispatchers who received the initial 911 calls, as well as 3 LPD officers, 13 LPD detectives, and the crime scene technician. The State presented testimony from a sergeant and an officer with the KU Med Police Department; two officers with the Kansas City, Kansas Police Department; a retired state trooper; the United States Deputy Marshal who arrested Smith and Singleton; and the Kansas Bureau of Investigation latent print examiner, DNA analyst, and firearm and toolmark examiner who examined items related to this case. Also testifying for the State were the manager of the Motel 6, the paramedic firefighter who transported Thomas to KU Med, the registered nurse who treated Carvin's gunshot wound at KU Med, Singleton's mother, and the Douglas County coroner.

"Frye and Marlowe each testified for the State. Because Squirrel was unavailable, the State read his preliminary hearing testimony into the record for the jury. Thomas did not testify; he invoked his Fifth Amendment right against self-incrimination to the judge, who excused him. The State introduced into evidence over 220 photographs; 3 diagrams; 2 lab reports; recordings of the 911 calls; the defendants' cell phone records; video footage from the motel, traffic light cameras, toll plaza cameras; and 3-D scans of the crime scene and the hallway outside. Much of the State's case consisted of identifying 'the men from Kansas City' as Carvin, Singleton, and Smith.

9

"At first, Carvin's defense largely consisted of calling officers and detectives to testify about internal inconsistencies in Marlowe's, Squirrel's, Thomas', and Frye's statements to police, as well as inconsistencies between Marlowe's and Frye's trial testimony and their prior statements. Carvin then testified on his own behalf, admitting that he, Smith, Singleton, and SirEric were at the motel during the shooting and reiterating his version of the relevant events as set forth above. On cross-examination, Carvin repeatedly denied any memory of speaking with LPD at KU Med.

"Smith then testified on his own behalf. As relevant here, Smith's version of the events largely paralleled Carvin's. Smith presented no other witnesses in his defense, and Singleton neither testified nor presented witnesses.

"The State called Detective Jamie Lawson as a rebuttal witness; Lawson had interviewed Carvin at KU Med and she testified that he was lucid and understood her questions. Lawson detailed Carvin's statement to her at KU Med, which included that he did not know the individual who drove him to Lawrence. Carvin eventually told Lawson that he heard Hooks or Thomas say, "'run that,'" so he believed he and his friends were being robbed. Carvin at first said no one from his group was armed, but later he said he might have picked up a gun that was next to him in the room.

"After deliberating, the jury found Carvin and Singleton guilty of the lesser offense of voluntary manslaughter of Hooks, aggravated battery of Frye, and aggravated assault of Marlowe but not guilty of attempted aggravated robbery and aggravated assault of Squirrel. The jury was unable to agree on a verdict for three of the counts against Smith and found him not guilty of aggravated robbery and aggravated assault of Squirrel." 2021 WL 1324030, at *1-6.

Before trial, Singleton moved for a separate trial. At the conclusion of a hearing, the district court denied the motion, essentially ruling that the three defendants did not have apparently antagonistic defenses. Singleton did not present evidence in his defense. Instead, Singleton argued that the State failed to meet its burden to convict him of any charges.

Three witnesses testified specifically about Singleton's actions during the State's case-in-chief. Frye testified that four African American males arrived in a blue or black Grand Prix. He testified that Singleton was one of the four men who came to the motel room and that everyone smoked marijuana together. Frye testified that he noticed the four men "hop up" and before he could see anything shots were fired. He just rolled over on the bed, covering his head and ears. Before the shots, Singleton was sitting behind Carvin. Frye testified that all four men had guns but could not say who fired guns, only that more than one gun fired. Frye testified that he saw all four men with guns out, but did not know who actually fired, just that "[a]ll of them had a black pistol." Frye did not see muzzle flashes, did not know who was shooting, and did not know whether Singleton was firing. Frye testified that he had only seen Singleton the night of the shooting, at the preliminary hearing, and at trial.

Marlowe testified that four African American males came to the motel room. He recognized Singleton from Kansas City the night before. Marlowe testified that the four men from Kansas City "hopped up" before the shooting began. Marlowe could not tell who was firing but knew which direction the shots came from. He did not see the shooting because a wall blocked his view, but he could tell the shots were coming from the four men from Kansas City. When the shooting stopped, Marlowe stood up and the four men from Kansas City were gone. Marlowe never saw Singleton with a gun, never saw him shooting, and "never saw him utter any angry words."

Squirrel did not testify at trial, but his preliminary hearing testimony was read into the record. Squirrel testified that Singleton came to the motel room with Carvin. The four men from Kansas City jumped up and there were gunshots. Squirrel ran, with his back to everyone. He did not know who pulled guns. He saw only one person with a gun before he ran out of the room and that person was not in the courtroom. He did not know Singleton and had not met him before that night at the motel. Before the shooting, everyone was friendly, just drinking and smoking. Squirrel only looked at Singleton a

few times, to pass him alcohol or marijuana. Other than in surveillance videos police showed him, Squirrel had not seen Singleton since the night at the motel. Squirrel never saw Singleton with a gun, never saw him shoot, and never heard him say anything in anger. He did not know if Singleton was one of the people who said "'[r]un everything'" before the shooting.

The district court sentenced Singleton to a controlling prison term of 117 months (9 years, 9 months).

Singleton timely appealed. After excusable delay in appointing conflict-free counsel, Singleton docketed this appeal.

ANALYSIS

I. *Did the district court err by consolidating all three defendants?*

Singleton argues that the district court erred in consolidating cases when he, Carvin, and Smith were charged separately. He asserts that the statutory provisions on joinder of charges, joinder of defendants, separate trials, and consolidation of trials do not allow a district court to join separately charged defendants. The State correctly notes that our Supreme Court has already considered and rejected Singleton's argument related to joinder of separately charged defendants.

A district court's denial of a motion to sever under K.S.A. 22-3204 is reviewed for abuse of discretion. The party claiming severance denial was error has the burden of establishing an abuse of discretion. *State v. Warren*, 302 Kan. 601, 617, 356 P.3d 396 (2015). The challenger must also prove that the severance denial resulted in prejudice, but the party benefitting from the error has the burden of demonstrating harmless error—or lack of prejudice. 302 Kan. at 617-18.

If two or more defendants were tried together without the requirements of K.S.A. 22-3202(3) having been met, "'a misjoinder results and is an absolute ground for reversal and separate trials.'" *State v. Davis*, 277 Kan. 231, 236, 83 P.3d 182 (2004).

There is no statute to consolidate the trials of two or more defendants who have been separately charged. Nevertheless, the district court has inherent authority to do so if the defendants could have been charged in the same complaint. The overriding consideration is whether a defendant will be prejudiced by joinder. *State v. Boyd*, 281 Kan. 70, 80-81, 127 P.3d 998 (2006).

Factors to consider in determining whether there is sufficient prejudice to require severance include:

> "'(1) [T]he defendants have antagonistic defenses; (2) important evidence in favor of one of the defendants which would be admissible in a separate trial would not be allowed in a joint trial; (3) evidence incompetent as to one defendant and introducible against another would work prejudicially to the former with the jury; (4) a confession by one defendant, if introduced and proved, would be calculated to prejudice the jury against the others; and (5) one of the defendants who could give evidence for the whole or some of the other defendants would become a competent and compellable witness on the separate trials of such other defendants.'" *State v. Stafford*, 296 Kan. 25, 38, 290 P.3d 562 (2012).

Singleton notes that the State charged him separately in an amended information alleging alternative counts of first-degree murder, aggravated battery, aggravated assault, and alternative counts of either attempted aggravated robbery or aggravated assault. The State charged Carvin and Smith in separate criminal cases. At the end of a preliminary hearing on all three defendants, the district court bound over the defendants for a joint trial, expecting to take up motions to sever.

Singleton moved for a separate trial, arguing antagonistic defenses and that statements by one party could seriously prejudice the other two defendants. At a hearing on the severance motions, Singleton argued that the defendants might raise antagonistic defenses and that Carvin's statements to police might prejudice his rights, necessitating trying him separately. The district court denied the motions to sever, finding that the defendants did not have antagonistic defenses.

On appeal, Singleton argues that the district court had no statutory authority to try all defendants together. K.S.A. 22-3202(3) allows the State to charge multiple defendants in the same complaint as follows:

> "Two or more defendants may be charged in the same complaint, information or indictment if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting the crime or crimes. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count."

But the text of K.S.A. 22-3202(3) is limited to defendants charged in the same complaint. K.S.A. 22-3202(3) provides no instruction for the situation here, where multiple defendants were charged in separate complaints rather than in the same complaint. If the defendants were charged in the same complaint, the district court would have authority to order separate trials under K.S.A. 22-3204. "When two or more defendants are jointly charged with any crime, the court may order a separate trial for any one defendant when requested by such defendant or by the prosecuting attorney." K.S.A. 22-3204.

In the case of a single defendant, K.S.A. 22-3203 allows for consolidation of separate indictments or informations. "The court may order two or more complaints, informations or indictments against a single defendant to be tried together if the crimes could have been joined in a single complaint, information or indictment." K.S.A. 22-

14

3203. No statutory provision allows for joint trial of separately charged defendants. Singleton argues that this gap in statutory provisions is meaningful: "Had the legislature intended for separately charged defendants to be tried jointly, it would have expressly provided for this." Thus, Singleton concludes that the district court erred by trying the three defendants jointly.

Singleton's argument fails for two reasons. First, Singleton failed to argue to the district court that it lacked statutory authority to consolidate the cases. Singleton argued that the defendants might have antagonistic defenses and that Carvin's statements to police necessitated a separate trial for Carvin. Singleton raises the statutory interpretation question for the first time on appeal. Issues not raised before the district court cannot be raised on appeal. See *State v. Green*, 315 Kan. 178, 182, 505 P.3d 377 (2022).

Second, our Supreme Court has already considered and rejected Singleton's statutory interpretation. "Although [K.S.A.] 22-3204, supra, is silent concerning the power of the trial court to consolidate trials on the motion of one or more of the defendants, the trial court has such inherent authority." *State v. Coe*, 223 Kan. 153, 157-58, 547 P.2d 929 (1977). "The test for joinder of two or more cases for trial is the same as that for charging two or more defendants in the same complaint, information or indictment and the determination rests in the sound discretion of the trial court." *State v. Tate*, 228 Kan. 752, 753, 620 P.2d 326 (1980). "Two or more defendants, charged in separate complaints or informations which allege that the defendants have participated in the same act or acts, may be later joined for trial if the defendants could have been charged in the same complaint, information, or indictment. [Citation omitted.]" *State v. Hunter*, 241 Kan. 629, 632-33, 740 P.2d 559 (1987); see also *State v. Anthony*, 257 Kan. 1003, 1017, 898 P.2d 1109 (1995).

In fact, our Supreme Court addressed Singleton's precise argument in *State v. Aikins*, 261 Kan. 346, 932 P.2d 408 (1997). Robert Aikins appealed his convictions for

15

aggravated robbery and felony murder. Aikins and his codefendant, Sheldon K. Nash, were tried together. 261 Kan. at 350; *State v. Nash*, 261 Kan. 340, 340, 932 P.2d 442 (1997). Aikins made the identical arguments that Singleton makes here about K.S.A. 22-3202(3) and K.S.A. 22-3204:

"Aikins contends that these statutes do not apply because Aikins and Nash were not charged together in the same complaint. As such, Aikins takes issue with the trial court's analogy between [K.S.A.] 22-3204 and the present situation. According to Aikins, just because a court is authorized by [K.S.A.] 22-3204 to sever the trials of two defendants who are charged together, this does not mean the court has the power to consolidate the trial of two defendants who were charged in separate complaints, without the specific authorization of a statute.

"Aikins properly points out that no statute authorizing such consolidation exists. However, Aikins is mistaken in his argument. Under Kansas case law, a trial judge may use his or her inherent authority and join or consolidate two defendants for trial, even if the defendants were charged in separate complaints, if the defendants could have been charged together in one complaint." *Aikins*, 261 Kan. at 358.

Our Supreme Court has thoroughly rejected Singleton's argument that the district court lacks authority to consolidate separately charged defendants for trial. The Kansas Court of Appeals is duty-bound to follow our Supreme Court precedent unless there is some indication that the Supreme Court is departing from its previous position. *State v. Patton*, 315 Kan. 1, 16, 503 P.3d 1022 (2022). Rather than indicate a departure, our Supreme Court has instead confirmed its adherence to this principle. If the criteria for charging defendants together are met, then "[i]t is permissible for several defendants to be joined together in one trial, when charged in separate complaints." *State v. Smith*, 268 Kan. 222, 233, 993 P.2d 1213 (1999) (citing *Aikins* and *Tate* for circumstances under which the defendants charged separately could be joined for trial). "There is no statute which authorizes consolidation when two or more defendants are charged in separate complaints as was done in this case. However, case law recognizes the inherent authority

16

of a trial judge to order consolidation. [Citation omitted.]" *Boyd*, 281 Kan. at 80. Because the district court did not err in exercising its inherent authority to consolidate cases for trial, we affirm Singleton's conviction.

II. *Was the evidence insufficient to convict Singleton?*

Singleton argues that the State's evidence was insufficient for a jury to convict him of any charged offense. The State argues that eyewitness testimony and forensic evidence allowed the jury to draw reasonable inferences and find Singleton guilty beyond a reasonable doubt.

> "'When the sufficiency of the evidence is challenged in a criminal case, we review the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. An appellate court does not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses.'" *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021).

"This is a high burden, and only when the testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt should we reverse a guilty verdict. [Citation omitted.]" *State v. Meggerson*, 312 Kan. 238, 247, 474 P.3d 761 (2020).

A verdict may be supported by circumstantial evidence, if such evidence provides a basis for a reasonable inference by the fact-finder regarding the fact in issue. Circumstantial evidence, in order to be sufficient, need not exclude every other reasonable conclusion. *State v. Colson*, 312 Kan. 739, 750, 480 P.3d 167 (2021).

A conviction of even the gravest offense can be based entirely on circumstantial evidence. *State v. Pattillo*, 311 Kan. 995, 1003, 469 P.3d 1250 (2020). There is no legal

distinction between direct and circumstantial evidence in terms of their respective probative value. *Aguirre*, 313 Kan. at 209.

Singleton argues that the State proved only his mere presence in the hotel room when the shooting occurred. He argues that criminal responsibility requires more than mere presence at the scene of the crime. Flatly, he is correct; and if the State's case ended there, his conviction could not stand.

But the State's evidence demonstrates more than Singleton recounts in his brief. The State's evidence included more than Frye's testimony that "all four" of Singleton's group had guns drawn before they began firing firearms. The State also presented ballistics evidence related to the gunshots. That is, Hooks suffered five gunshot wounds with entry and exit points mostly consistent with him facing away from the shooters. Frye suffered four gunshot wounds. Thomas suffered eight gunshot wounds. Because Marlowe dropped to the floor behind a bed, he avoided being shot.

Police showed the jury evidence of 25 bullet holes throughout the room. Police recovered 24 cartridge casings, 20 bullets, 2 bullet fragments, and 4 "foreign objects" from Frye's person. Those cartridge casings showed the use of four different firearms.

Frye had a silver and black 9mm Ruger. He testified that he did not fire back. But after the shooting happened, he threw his 9 mm Ruger out the window so police would not recover it. Police found Frye's gun in a flowerbed outside the motel room. Thomas had a black Ruger with an extended clip, which police found in the parking lot.

None of the casings found in the room matched either Frye's gun or Thomas' gun, recovered from the scene. Analysis of the casings showed that four different guns fired those rounds, four firearms which were never collected by police. Police found no guns at the scene other than Frye's and Thomas' guns. Carvin admitted to shooting a semi-

18

automatic .380 firearm "four or five" times, which would account for the five .380 cartridge casings found at the scene. The consequence of all this forensic evidence suggested that Singleton fired one of the remaining three unaccounted-for firearms.

Circumstantial evidence supported the jury's conclusion that he did. The State's evidence showed from the bullet holes in the motel room that the gunfire traveled from north to south. Testimony from Frye, Marlowe, and Squirrel placed Singleton toward the north end of the room. Even Singleton's codefendants, Carvin and Smith, placed him at the north part of the room. While Singleton was driving them away after the shooting, Carvin watched Singleton throw both of their guns out their vehicle's window. Viewing this evidence in a light most favorable to the State, a rational fact-finder could have found Singleton guilty beyond a reasonable doubt. Because the State's evidence was sufficient to support the jury's conviction, we affirm Singleton's convictions.

For the preceding reasons, we affirm.

Affirmed.